IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 20-cv-00380-CMA-SKC

THE LODGE AT MOUNTAIN VILLAGE OWNER ASSOCIATION, INC.,

    Plaintiff,

v.

EIGHTEEN CERTAIN UNDERWRITERS OF LLOYD'S OF LONDON SUBSCRIBING TO POLICY NUMBER N16NA04360, and
MCLARENS LLC,

    Defendants.

## ORDER GRANTING DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants Eighteen Certain Underwriters of Lloyd's of London Subscribing to Policy Number N162NA04360's ("Certain Underwriters") and McLarens, LLC's ("McLarens") (collectively the "Defendants") Amended Motion for Summary Judgment (the "Motion"). (Doc. # 75) The Court has reviewed the Motion, Plaintiff's Response[1] (Doc. # 82), Defendants' Reply (Doc. # 85), and the accompanying evidence submitted by the Parties (Doc. ## 75-1 and 82-1). The Motion is granted for the following reasons.

---

[1] The Court notes that Plaintiff's Response (Doc. # 82) was not signed by counsel, in violation of the Federal Rules of Civil Procedure, the Local Rules of Practice of the United States District Court for the District of Colorado, and the Court's Practice Standards. However, in the interest of judicial economy, the Court has considered the Response in reaching a decision on the merits.

I.     **BACKGROUND**

**A.     THE POLICY**

This is an insurance coverage dispute. Plaintiff The Lodge at Mountain Village Owners Association, Inc. ("The Lodge") is an owners' association located near Telluride, Colorado. (Doc. # 5 at 3–6.) On behalf of The Lodge, Plaintiff's former property manager, Noble House Hotel & Resorts, Inc. ("Noble House"), purchased insurance policy number N16NA04360 (the "Policy) from Certain Underwriters, on behalf of The Lodge. (Doc. # 75-1 at 5–52.)

The Policy provides coverage, subject to the Policy's terms and limitations, with effective dates from April 1, 2016, until April 1, 2017. (Doc. # 5 at ¶¶ 6–7; Doc. # 75-1 at 5–52.) Specifically, the Policy provides coverage for "All Risks of Direct Physical Loss or Damage except as hereinafter excluded." (Doc. # 75-1 at 8.)

Under the "Perils Excluded" clause, the Policy "does not insure" the following perils:

> (b)    Against the cost of making good defective design or specifications, faulty material, or faulty workmanship, unless physical loss or damage by a peril not excluded ensues and then this policy shall only cover for such ensuing loss or damage; . . .
>
> (d)    Against ordinary wear and tear, latent defect, inherent vice or gradual deterioration; unless physical loss or damage by a peril not excluded ensues and then his policy shall only cover for such ensuing loss or damage . . .

(*Id.* at 19 ¶ 7.)

The Policy requires The Lodge to provide notice of loss "[a]s soon as practicable," and The Lodge must "report such loss or damage with full particulars to

Underwriters." (*Id.* at 24 ¶ 22.) The Policy also requires the insured "to render a signed and sworn Proof of Loss to Underwriters or its appointed representative, stating: The place, time and cause of the loss, damage or expense within 90 days of such loss or damage; the interest of the Insured and of all others; the value of the property involved in this loss; and the amount of loss, damage or expense." (*Id.* at 33 ¶ 23.)

**B.    HISTORY OF THE PROPERTY**

1. <u>The Exterior of the Property</u>

The Lodge consists of "ten individual cabins, three multi-unit condominium buildings, and a main lodge." (Doc. # 75-1 at 104.) The parties agree that the three multi-unit condominium buildings (the "Property") are the subject of this lawsuit. The Property was constructed in 1999, and the exterior is clad with a stone veneer and log siding. (Doc. # 75-1 at 104.) Both parties' experts agree that the log siding requires upkeep in the form of a sealant called chinking in the joints between the logs. The original chinking was installed at the time of construction. (Doc. # 82-1 3–5.)

In 2006, The Lodge retained contractors to perform maintenance on the original chinking. (*Id.* at 4–5.) Seven years later, The Lodge's General Manager, Steve Togni, determined that The Lodge required additional staining and chinking. (Doc. # 75-1 at 234.) Thus, on or around March 19, 2014, The Lodge retained Pedro Lorenzo of L&H Painting ("L&H") to stain, finish, and perform chinking repairs to the log siding. (Doc. # 75-1 at 221–222.) L&H commenced work on the log siding on or about April 7, 2014, and work was completed in August 2014. (*Id.* at 75-1 at 185 ¶¶ 6–9.)

3

### 2. Claims Against Plaintiff's Contractor for Work Performed on the Property

According to Plaintiff, L&H's repairs to the log siding were defective. (Doc. # 75-1 at 86–88; 184–194.) On July 15, 2015, representatives of The Lodge informed L&H that its work was defective, stating that several logs were "extremely weathered." (Doc. # 75-1 at 80.) In connection with its complaints against L&H, Plaintiff retained an expert, Bill de Alva of AVLÁED, LLC, to inspect the log siding and "prepare a report concerning the defects." (*Id.* at 186 ¶ 16.) In his report dated May 2, 2016, Mr. de Alva identified numerous defects associated with L&H's work. (*Id.* at 89–102.)

Specifically, Mr. de Alva opined that the log finish and underlying wood were deteriorating as a result of L&H's work. (*Id.*) Mr. de Alva stated that "the severe weathering on the full-log structures is more of a concern because if neglected, further weathering will eventually threaten the structural integrity of the log structure." (*Id.* at 90 ¶ 3.) Further, "[s]ome log siding and bottoms of timber door frames are not properly protected from constant exposure to moisture from snow, rain and brine from ice-melting salt. In some instances the wood is disintegrating and may be further endangered by fungal rot." (*Id.* at ¶ 4.) Pictures included with Mr. de Alva's report show weathered logs, peeling chinking, water damage, leaking gutters, and dry-rot of siding. (*Id.* at 93–102.)

On October 12, 2016, The Lodge filed suit against L&H, alleging construction defects in connection with the 2014 chinking and sealant work. (Doc. # 75-1 at 184–194.) The complaint against L&H asserts that in or around July 2015, The Lodge discovered "severe defects" related to L&H's work. (*Id.* at 185 ¶ 10.) As a result of these

4

defects, the log siding "appeared extremely weathered." (*Id.*) On or about November 29, 2017, The Lodge reached a settlement with L&H. (Doc. # 75-1 at 225–227.) The settlement agreement provides for a full and final release of all claims in connection with the construction defects. (*Id.*) Shortly after settlement, The Lodge dismissed its lawsuit against L&H.

**C.    THE JUNE 2017 CLAIM**

In June 2017, The Lodge filed an insurance claim (the "June 2017 Claim") under the Policy. (Doc. # 75-1 at 3–4; Doc. # 85-1 at 18.) The date of loss for the claim was listed as April 20, 2016. (*Id.*) The Lodge described the loss as "[e]valuation and assessment of log finish and chinking at Mount Lodge Telluride." (*Id.*) According to Plaintiff's discovery responses in this action, the date of loss of April 20, 2016, was selected by Mr. Togni based on his memory, and the date was selected in June 2017. (*Id.* at 152.)

However, Mr. Togni testified that he picked the April 2016 date of loss because "we decided it just wasn't acceptable, and our concerns grew from what they were the year leading up to that," referring to L&H's construction defects. (Doc. # 82-1 at 8.) Mr. Togni also testified that water intrusion into the Property occurred "over time" and he started noticing the water intrusion "after the restaining and rechinking" project in 2014. (*Id.* at 13–14.)

On August 7, 2017, a representative of McLarens—an independent insurance adjuster—inspected the Property on behalf of Certain Underwriters. (Doc. # 75-1 at 53.) Mr. Togni was present for the inspection. (*Id.*) On September 6, 2017, McLarens sent a

5

letter to Noble House, on behalf of The Lodge, requesting cooperation in the investigation of the April 2016 Claim. (*Id.* at 54–56.) McLarens requested a number of documents and correspondence, which it described as "material to Underwriters' investigation." (*Id.* at 55.)

On February 20, 2018, McLarens denied the June 2017 Claim on the grounds that the Policy excluded coverage for faulty material, faulty workmanship, gradual deterioration, and wear and tear. (*Id.* at 58–59.) McLarens also noted that Certain Underwriters had been prejudiced by The Lodge entering into the Settlement Agreement with L&H. (*Id.* at 59–60.)

D.   ADDITIONAL EXPERT REPORT AND THE RENEWED CLAIM

   1.   The Pie Engineering Report

After the June 2017 Claim was denied, Plaintiff retained Pie Consulting & Engineering ("Pie") on August 10, 2018, to inspect The Lodge. (Doc. # 75-1 at 104.) Pie prepared an Observation Report ("Pie Report"), dated November 28, 2018. (*Id.* at 104–150.) Pie was specifically "retained by Jorgensen Brownell & Pepin PC"—Plaintiff's counsel in this litigation—"to investigate the extent of water-related damages to the building as a result of the faulty exterior chinking and stain repairs." (*Id.* at 106 ¶ C.) Pie's scope of work included conducting "site observations of existing conditions of chinking and concerns of possible damage to the building exteriors" and documenting "possible resultant damage." (*Id.* at ¶¶ C–E.)

Pie conducted a site inspection on August 27 and 28, 2018. (*Id.* at 107 ¶ A.) Pie observed that the wood siding at the Property was "heavily weathered." (*Id.* at 120 ¶ E.)

6

Further, the chinking repairs were heavily deteriorated, particularly in areas "which received increased moisture, including beneath roof eaves and valleys without accompanying gutters and downspouts." (*Id.* at 121 ¶ F.) Pie observed several areas where the log siding was removed. In those areas, Pie noted that the chinking between the siding and the assessment area was heavily deteriorated. (*Id.* at 126–139.) The logs that were removed showed biological growth, water staining, and heavy deterioration. (*Id.*)

Pie concluded that water damage occurred at the Property "due to the failure of the chinking sealant and overlying chinking tape repairs on the log siding." (*Id.* at 139 ¶ A.) The areas with failed chinking were associated with "increased moisture due to the roof runoff from rain and melting snow events." (*Id.* at ¶ A.1.) Pie opined that the deterioration of the wall sheathing behind the log siding was caused by water penetrating as a result of the defective chinking. (*Id.* at 139–140.) Further, Pie stated that "water-damage has occurred to the plywood and OSB sheathing of the multi-unit condominium buildings due to the failure of the chinking sealant and overlying chinking tape repairs to the log siding." (*Id.* at 139 ¶ A.) Pie noted that, while it is possible that some deteriorating occurred before the 2014 chinking repairs, "the wall assembly has been subject to four . . . years of elevated moisture due to the premature failure of the chinking repairs." (*Id.* at 140 ¶ 4.)

2.  Plaintiff's Request to Reopen the June 2017 Claim

On December 10, 2018, counsel for Plaintiff sent a letter to McLarens, requesting that Underwriters reopen the Claim. (Doc. # 75-1 at 64–67.) The letter identifies the type

7

of loss as "[d]amage as a result of faulty workmanship." (*Id.* at 64.) The letter also identifies the date of loss as April 20, 2016, and it specifically references the Policy at issue in this case. (*Id.*)

Although Plaintiff acknowledged in the letter that "faulty workmanship is excluded," Plaintiff asserted through counsel that the Policy does cover the "physical loss or damage which has ensued subsequent to faulty workmanship." (*Id.* at 65.) Plaintiff's counsel sent a second letter on February 18, 2019, again requesting an inspection related to the April 20, 2016, date of loss. (Doc. # 82-1 at 33–34.)

On March 4, 2019, Defendants, through counsel, denied the claim a second time. (*Id.* at 68–80.)

### E. PROCEDURAL HISTORY

After Defendants denied the claim, Plaintiff sued Certain Underwriters and McLarens. (Doc. # 5.) In its complaint, Plaintiff brings claims for breach of contract, statutory bad faith, and common law bad faith. (*Id.* at 3–5.) Defendants moved for summary judgment on each of these claims. (Doc. # 75.) This matter is now ripe for review.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir.

2004). Once the movant meets its initial burden, however, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

### III.   ANALYSIS

**A.   BREACH OF CONTRACT CLAIM**

Defendants argue that they are entitled to summary judgment because Plaintiff's breach of contract claim fails for multiple independent reasons, including lack of coverage under the Policy. The Court agrees.

1.   Legal Standard Governing Interpretation of Insurance Policies

In Colorado, a party attempting to recover on a claim for breach of contract must prove: (1) existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform by the defendant; and (4) resulting damages. *Walkinshaw v. USAA Cas. Ins. Co.*, No. 19-CV-01972-PAB-MEH, 2022 WL 356825, at *5 (D. Colo. Feb. 7, 2022) (citation omitted).

An insurance policy is a contract, and it should be interpreted consistently with the well-settled principles of contractual interpretation. *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided. *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990). Clauses or phrases

should not be viewed in isolation; rather, a policy's meaning must be determined by examining the entire instrument. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). Policy provisions that are clear and unambiguous should be enforced as written. *Chacon*, 788 P.2d at 750.

Further, the meaning of an insurance policy is a question of law for the Court to decide. *Huizar*, 52 P.3d at 819. Where a term in an insurance policy is ambiguous, the Court will construe the term in favor of coverage. *Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010). However, mere disagreement between the parties about the meaning of a term does not create ambiguity. *Union Rural Elec. Ass'n v. Public Utils. Comm'n*, 661 P.2d 247, 251 (Colo.1983).

Moreover, the mere fact that a term may be susceptible to multiple interpretations, or that it may have different definitions in different contexts, does not alone create an ambiguity. *See id.*; *see also Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo. App. 1996). Rather, a term is ambiguous only when it is reasonably susceptible to multiple interpretations in the context in which it is used. *Juniel*, 931 P.2d at 513. Courts may not read an ambiguity into a term where none exists. *Martinez v. Hawkeye–Sec. Ins. Co.*, 576 P.2d 1017, 1019 (Colo. 1978) ("[C]ourts will not force an ambiguity in order to resolve it against an insurer.").

Where, as here, an insurance company seeks to limit or exclude coverage under the terms of an insurance policy, the insurer bears the burden of proving that a particular loss falls within an exclusion in the contract. *Arkansas Valley Drilling, Inc. v. Cont'l W. Ins. Co.*, 703 F. Supp. 2d 1232, 1238 (D. Colo. 2010) (citation omitted).

However, when an insurance company shows that an exclusion applies, the burden falls on the insured to show the applicability of an exception to the exclusion. *Rodriguez By & Through Rodriguez v. Safeco Ins. Co. of Am.*, 821 P.2d 849, 853 (Colo. App. 1991).

  2. <u>The Policy Does Not Provide Coverage for the Damage Caused by Faulty Workmanship or Construction Defects</u>

It is not disputed that the water damage to the Property stems from L&H's faulty workmanship. The parties dispute, however, whether the Policy covers the alleged damage. Although the Policy provides coverage for all risks of direct physical loss or damage, one of the perils excluded in the Policy is "the cost of making good defective design or specifications, faulty material, or faulty workmanship." (Doc. # 75-1 at 8; 19 ¶ 7.) Coverage may be restored under the ensuing loss provision, but only if "physical loss or damage by a peril not excluded ensues and then this policy shall only cover for such ensuing loss or damage." (*Id.* at 19 ¶ 7.)

Plaintiff now argues that it seeks coverage for water damage to the Property, including water damage to the sheathing and plywood underneath the logs that were damaged by L&H. (Doc. # 82 at 3–4.) Plaintiff argues that this damage was not caused by L&H and was "previously unknown" until it received the Pie Report. (*Id.* at 4.) Plaintiff frames this argument as "ensuing" from the faulty workmanship.

The Court notes that the law with respect to ensuing damage caused by excluded perils is in flux, with courts around the country reaching different results. *See Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020) (collecting and examining cases, while noting that Colorado state courts have

not weighed in on the issue). However, the weight of authority does not support Plaintiff's position.[2]

The court's decision in *Travelers Indemnity Company v. Board of County Commissioners for Larimer County*, 508 F. App'x 733 (10th Cir. 2013) is instructive. In that case, the insured made an insurance claim for damage to its roofs caused by heavy snow following a snowstorm. *Id.* at 734. The insurer denied the claim after it concluded that the damage was caused by design and construction defects and was, therefore, excluded from coverage. *Id.* The insured filed suit and argued that the weight of snow was a separate covered loss that would bring the claim within policy coverage, even if some of the damage was also caused by construction defects. *Id.* The lower court entered summary judgment in favor of the insured after it determined that the defective construction of the roof was the causal agent of the damage, not the snow itself. *Id.* The Tenth Circuit affirmed the decision for substantially the same reasons as the district court. *Id.* at 736.

Similarly, in this case, the construction defect was the causal agent of the damage, not a later covered peril. In discovery Plaintiff admitted that the damage it claims in this case is the same "type of damages ensuing from L&H Painting's faulty

---

[2] In its briefing, Plaintiff included a string cite to a number of cases in other jurisdictions, arguing that "[o]ther courts have analyzed similar policies and found that damages similar to Plaintiff's fell within coverage under each respective policy." (Doc. # 82 at 17.) While the Court acknowledges the conflicting case law around the country, the cases cited by Plaintiff do not save its breach of contract claim. Indeed, the cases support dismissal of the claim in this case based upon the facts of this case. *See Weitz Co. LLC v. Lloyd's of London*, No. 4:04-CV-90353-TJS, 2010 WL 11506866 (S.D. Iowa Dec. 20, 2010); *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 507 (5th Cir. 2000); *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402 (D. Conn. 2002).

workmanship" which "include the water damage to the OSB, OSB sheathings, and plywood" as outlined in the Pie Report. (Doc. # 75-1 at 158.) Multiple experts—including Plaintiff's experts—opined that the damage to the OSB, OSB sheathing, and plywood resulted from L&H's faulty construction. (*Id.* at 139–142.) Plaintiff's argument to the contrary is not supported by the evidence submitted by the parties.

Plaintiff also argues that *Rocky Mountain Prestress* saves its breach of contract claim from dismissal, stating that the court applied relevant policy language "harmoniously" and "determined that 'a defective workmanship-exclusion does not provide coverage for the costs of repairing defectively designed or constructed parts of a structure; rather, the exception only restores coverage for damage sustained when the defective workmanship becomes the cause of additional separate damage.'" (Doc. # 82 at 17 (quoting *Rocky Mountain Prestess*, 960 F.3d 1255 at 1261-62.)) Plaintiff's citation omits key language from *Rocky Mountain Prestess*, in which the court examined the state of the law with respect to ensuing loss provisions and stated that "[r]egardless of how broadly courts interpret" such provisions, "they are all in agreement on one overarching principle: the exception cannot be allowed to swallow the exclusion." *Id.* at 1261.

Similarly, in this case, to read the Policy as Plaintiff suggests would transform coverage to include the very damage caused by the construction defect, which is excluded under the Policy. Such a result would allow the exception to swallow the exclusion. The law does not permit this result. *Id.*; *see also A. D. Irwin Invs., Inc. v. Great Am. Ins. Co.*, 28 Colo. App. 570, 574, 475 P.2d 633, 635 (1970) (noting that the

insurance company did not become "a guarantor of perfect performance" concerning maintenance of air conditioning system which caused damage).

In sum, Plaintiff points to no evidence from which a reasonable jury could find that it sustained a loss beyond its costs of repairing the faulty workmanship and construction defects caused by L&H. There is no material dispute that the damage to the Property was caused by L&H's failure to properly seal the wood logs, which led to water penetrating behind the logs. This claimed loss unambiguously falls within the Policy's exclusion for defective workmanship, and the Policy's ensuing loss exception does not restore coverage for this expressly excluded cause. Any contrary interpretation would contradict the terms of the Policy and permit the exception to swallow the rule. *See Rocky Mountain Prestress, LLC*, 960 F.3d at 1264; *see also Ames Privilege Assocs. Ltd. P'ship v. Utica Mut. Ins. Co.*, 742 F. Supp. 704, 707 (D. Mass. 1990) (noting that damage cannot be simultaneously a covered peril and a peril which is excluded). Accordingly, the Court finds that Defendants are entitled to judgment as a matter of law with respect to Plaintiff's claim for breach of contract.

    3.    <u>The Policy Does Not Provide Coverage for Ordinary Wear and Tear or Gradual Deterioration</u>

In its response to the Motion, Plaintiff now argues that it has never sought coverage for the damages resulting from L&H's construction defects. (Doc. # 82 at 18.) Rather, Plaintiff now argues that it has "repeatedly requested Defendants perform an investigation of" apparently newly identified water damage. (*Id.*) Plaintiff attempts to frame the dispute as one involving rain and snow.

14

Plaintiff's assertion is disingenuous at best. The exhibits submitted by the parties—including by Plaintiff—show that Plaintiff repeatedly requested that Certain Underwriters provide coverage for the damage caused by construction defects. Plaintiff's own complaint states that it is seeking "to recover losses sustained as a result of damages ensuing from faulty workmanship" on the Property. (Doc. # 5 at 2 ¶ 9.)

In addition, the June 2017 Claim lists the loss as an "[e]valuation and assessment of log finish and chinking at Mount Lodge Telluride." (Doc. # 75-1 at 3–4; Doc. # 85-1 at 18.) When counsel for Plaintiff requested that McLarens reopen the June 2017 Claim, he identified the type of loss as "[d]amage as a result of faulty workmanship" and asserted that physical loss or damage that "ensued" from the faulty workmanship should be covered. (Doc. # 75-1 at 64–67.) Moreover, Plaintiff stated in discovery responses that the damage it claims in this case ensued "from L&H Painting's faulty workmanship" which included the water damage to the sheathings and plywood. (Doc. # 75-1 at 158.) Although Plaintiff identified snow and water as a "covered peril," it still claimed the damage was caused by the faulty workmanship. (Doc. # 82-1 at 41–42.)

Further, Plaintiff's attempt to reframe this dispute does not save its claims. In its response, Plaintiff argues repeatedly that its damages resulted from "slow, hidden, and repeated intrusion of water," a "slow infection of water damage caused by the prolonged and repeated intrusion of water," and "slow and discrete infiltration of water [which was] consequential, gradual, and progressive." (Doc. # 82.) Plaintiff's argument supports dismissal because such gradual deterioration is not covered by the Policy.

The Policy excludes coverage for "ordinary wear and tear, latent defect, inherent vice or gradual deterioration." (Doc. # 75-1 at 19 ¶ 7.) Plaintiff admitted in its response that water has seeped into the Property for years. (*See* Doc. # 82.) Mr. Togni also testified that water intrusion into the Property occurred "over time," and he started noticing the water intrusion "after the restaining and rechinking" project in 2014. (*Id.* at 13-14.) The Pie Report identified "deterioration of the wall sheathing and log siding" that "was consistent with long-term exposure to elevated moisture content" of months or years. (Doc. # 75-1 at 140.) Mr. de Alva informed Plaintiff in 2016 that the severe weathering of the logs, as a result of the L&H construction, would lead to further weathering that would threaten the structural integrity of the logs. (*Id.* at 90 ¶ 3.)

Thus, to the extent Plaintiff now argues that its damage is a result of gradual deterioration and water gradually seeping into the Property, the Court finds as a matter of law that gradual deterioration and wear and tear are excluded by the terms of the Policy. Such claimed loss unambiguously falls within the Policy's exclusion for gradual deterioration, and Plaintiff has pointed to no exception that would restore coverage for this expressly excluded cause of loss. *RK Mech., Inc. v. Travelers Prop. Cas. Co. of Am.*, 944 F. Supp. 2d 1013, 1020 (D. Colo. 2011) (noting that [i]f the insurer shows that the exclusion applies, the burden shifts back to the insured to prove the applicability of an exception to the exclusion"). Accordingly, Plaintiff's breach of contract claim fails for this additional reason.

### 4. Plaintiff's Failure to Comply with the Notice Provision of the Policy

Where an insurance policy contains a notice provision, and the insured fails to comply with that notice provision, "the insurer is relieved of its duty to the insured." *Cherry Grove E. II Condo. Ass'n, Inc. v. Philadelphia Indem. Ins. Co.*, No. 16-CV-02687-CMA-KHR, 2017 WL 6945038, at *5 (D. Colo. Dec. 20, 2017) (discussing difference in late Notice-Prejudice Rule and Traditional Rule and determining that Traditional Rule is applicable to first-party claims such as the one in the instant case); *656 Logan St. Condo. Ass'n, Inc. v. Owners Ins. Co.*, 389 F. Supp. 3d 946, 956 (D. Colo. 2019) (finding that notice-prejudice rule does not apply in Colorado to first-party property casualty claims brought under HOA policies and granting the defendant summary judgment on the plaintiff's breach of contract claim in light of the plaintiff's unreasonably late notice).

The Policy required Plaintiff "[a]s soon as practicable after any loss occurring under this policy . . . [to] report such loss or damage with full particulars to Underwriters." (Doc. # 75-1 at 24 ¶ 22.) In this case, L&H performed the chinking and sealant work in 2014. Mr. Togni testified that water intrusion into the Property occurred "over time" and he started noticing the water intrusion "after the restaining and rechinking" project in 2014. (Doc. # 82-1 at 13-14.) Plaintiff began discussing the defective work with L&H by at least July 2015 (Doc. # 75-1 at 80.) Plaintiff filed suit against L&H in October 2016. Plaintiff did not file a claim with Certain Underwriters until June 2017. Thus, The Lodge did not report the alleged loss to Certain Underwriters for at least 24 months after discovering the damage.

17

Plaintiff argues that it could not provide notice of the claim until it discovered the damage in November 2018 when it conducted destructive testing. Plaintiff states that it asked Defendants to reopen the claim "for previously unknown damage to the OSB and plywood." (Doc. # 82 at 4.) Plaintiff's assertion is undermined by the undisputed facts in this case. Plaintiff was aware of continuous, ongoing leaks from at least 2014. It began discussing its claims—including water damage—with L&H in 2015. In 2016, Mr. de Alva informed Plaintiff that it would need to address the severe weathering on the log structures "because if neglected, further weathering will eventually threaten the structural integrity of the log structure." (Doc. # 75-1 at 90 ¶ 3.) Further, Mr. de Alva stated that the log siding was "not properly protected from constant exposure to moisture from snow, rain and brine from ice-melting salt" causing the wood to disintegrate. (*Id.* at ¶ 4.) The damage outlined in the December 2018 letter from counsel is the same alleged damage identified in the June 2017 Claim, which was identified by Plaintiff's experts and representatives as early as 2015.

Plaintiff also argues that it could not discover the damage to the Property until it conducted destructive testing in August 2018, and it did not receive the results until November 2018. (Doc. # 82 at 11.) However, once again, Plaintiff's assertion in response to the Motion is refuted by Plaintiff's own expert, Mr. de Alva. Mr. de Alva's May 2016 report, identifying the conditions of which Plaintiff now complains, demonstrates that Plaintiff was aware of the damage by at least May 2016, if not sooner when the construction defects were identified in 2015.

Ordinarily, what constitutes a reasonable time for giving notice as provided in insurance policies is a question of fact for the jury. *Cherry Grove E. II*, 2017 WL 6945038, at *5 (citing *Certified Indem. Co. v. Thun*, 165 Colo. 354, 360, 439 P.2d 28, 30 (1968)). However, where, as here, "facts are undisputed and only one inference can be drawn therefrom, it is a question of law for the court." *Thun*, 165 Colo. at 360. The Court finds it is indisputable as a matter of law that The Lodge did not notify Defendants of the claim within a reasonable time. Accordingly, the Court dismisses the breach of contract claim against Defendants for this additional reason.[3]

### B. PLAINTIFF'S BAD FAITH CLAIMS FAIL AS A MATTER OF LAW BECAUSE PLAINTIFF'S BREACH OF CONTRACT CLAIM HAS BEEN DISMISSED

Defendants also move for summary judgment on Plaintiff's statutory and common law bad faith claims. (Doc. # 75 at 29–30.) Defendant argues that because there is no coverage under the Policy, Plaintiff's bad faith claims must fail. (*Id.*) The Court agrees.

Once a court concludes that the insurance company's denial of coverage was proper as a matter of law, the plaintiff's bad faith claims must fail as well. *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1192–93 (10th Cir. 2009) (dismissing bad faith claims after determining that coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage); *Walkinshaw*, 2022 WL 356825, at *7–8 (dismissing bad faith claims after determining that the denial

---

[3] Because the Court has found three independent reasons to dismiss the breach of contract claim against Defendants, the Court need not address the remaining arguments for dismissal made by Defendants.

of coverage was proper). The Court has already determined that Defendants properly denied coverage under the Policy. Accordingly, because the bad faith claims flow from the denial of coverage, the Court finds as a matter of law that Plaintiff cannot proceed on its common law or statutory bad faith claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED. The Court hereby ORDERS as follows:

- Defendants' Amended Motion for Summary Judgment (Doc. # 75) is GRANTED.

- Any motions for costs or fees shall be filed within 21 days of the date of this Order.

- The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff on all claims asserted in this case.

DATED: March 18, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge